2017-2150

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

WILLIAM C. BOND,

*Appellant*,

v.

UNITED STATES,

*Appellee.*

———————————

Appeal from the United States District Court for the
District of Maryland, Case No. 1:16-cv-02723-DAF,
Senior District Judge David A. Faber

———————————

Richard A. Posner
Office of Richard Posner
1222 East 56th Street
Chicago, Illinois 60637
(773) 955-1351
rposner62@gmail.com

*Counsel for Appellant*

Matthew J. Dowd
Dowd PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 573-3853
mjdowd@dowdpllc.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................. 3

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ................. 4

CONCISE STATEMENT OF THE CASE AND FACTUAL
    BACKGROUND ..................................................................................... 4

I.    Procedural Background ....................................................................... 4

II.    Factual Background ............................................................................ 6

    A.    William Bond Has Engaged in a Years-Long Effort to
         Expose What He Sees as Corruption in the Baltimore
         Judiciary and Law Enforcement Community ........................ 6

    B.    The Present Dispute Stems from the Surveillance and
         Intimidation of William Bond by the FBI and the U.S.
         Marshals Service .................................................................. 10

    C.    Bond's Original Pro Se Complaint Contained Six
         Counts, Including Claims Based on *Bivens*, the First
         and Second Amendments, and Due Process ........................ 18

    D.    The District Court Dismissed Bond's Complaint for
         Failure to State a Claim ....................................................... 18

    E.    Bond Sought to Amend His Complaint to Cure the
         Deficiencies the District Court Identified in Its
         Dismissal Order ................................................................... 22

    F.    Without Any Explanation, The District Court Denied
         Bond's Second Attempt to Amend His Complaint, Even
         Though Bond Added Substantial New Factual
         Allegations and Included Sixteen Exhibits ......................... 24

SUMMARY OF THE ARGUMENT ......................................................... 28

ARGUMENT ....................................................................................... 30

I.     Standards Of Review ........................................................ 30

II.    The District Court Abused Its Discretion When It Denied, Without Any Justification, The Second Motion To Amend The Complaint ................................................................... 32

     A.    A Trial Court Abuses Its Discretion When It Ignores The Substance of New Allegations in a Pro Se Motion to Amend .................................................. 32

     B.    The District Court Gave No Consideration to the Additional Allegations Relating to the First Amendment Violations ........................................... 38

     C.    The District Court Did Not Address the *Bivens* Claims Against the Newly Named Defendants ................................. 41

III.   The Second Amended Complaint Alleges A Valid *Bivens* Action Under the First Amendment ............................... 44

     A.    Bond Properly Alleged Violations of His First Amendment Right to Protest Against the Maryland Judiciary .............................................................. 46

          1.   The Threshold Standing Requirement for a First Amendment Claim is More Liberally Construed .......... 46

          2.   The Threats of Arrest by the Federal Law Enforcement Officers Chilled Bond's Planned Protests ................................................................ 48

     B.    The Second Amended Complaint Asserts a Valid *Bivens* Action Against the Named Defendants.................... 52

IV.   Conclusion ..................................................................... 53

V.    Request for Oral Argument .......................................... 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Arizona Right to Life Political Action Committee v. Bayless*,
   320 F.3d 1002 (9th Cir. 2003)................................................................. 51

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ............................................................................... 52

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................... 52, 53

*Benham v. City of Charlotte*,
   635 F.3d 129 (4th Cir. 2011)............................................47, 49, 50, 51

*Board of County Commissioners, Wabaunsee County v. Umbehr*,
   518 U.S. 668 (1996) ............................................................................... 51

*Constantine v. Rectors & Visitors of George Mason University*,
   411 F.3d 474 (4th Cir. 2005)................................................................. 49

*Cooksey v. Futrell*,
   721 F.3d 226 (4th Cir. 2013).......................................29, 30, 46, 47, 51

*Cortec Industries, Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) .................................................................... 39

*David v. Alphin*,
   704 F.3d 327(4th Cir. 2013).................................................................. 34

*Davis v. Piper Aircraft Corp.*,
   615 F.2d 606 (4th Cir. 1980)................................................................. 45

*DCD Programs Ltd. v. Leighton*,
   833 F.2d 183 (9th Cir. 1987)................................................................. 34

*Doe v. Bolton*,
   410 U.S. 179 (1973) ............................................................................... 50

*Edwards v. City of Goldsboro,*
178 F.3d 231 (4th Cir. 1999)................................................................44

*Equal Rights Center v. Niles Bolton Associates,*
602 F.3d 597 (4th Cir. 2010)...............................................................34

*Erickson v. Pardus,*
551 U.S. 89 (2007) (per curiam) ....................................................2, 45

*Estelle v. Gamble,*
429 U.S. 97 (1976) ................................................................................2

*Foman v. Davis,*
371 U.S. 178 (1962) ................................................................... *passim*

*Francis v. Giacomelli,*
588 F.3d 186 (4th Cir. 2009)...............................................................45

*Galustian v. Peter,*
591 F.3d 724 (4th Cir. 2010)...............................................................32

*Griggs v. Hinds Junior College,*
563 F.2d 179 (5th Cir. 1977)...............................................................34

*Haines v. Kerner,*
404 U.S. 519 (1972) ..............................................................................2

*Horsley v. Feldt,*
304 F.3d 1125 (11th Cir. 2002)...........................................................39

*In re PEC Solutions, Inc. Securities Litigation,*
418 F.3d 379 (4th Cir. 2005)...............................................................34

*Initiative & Referendum Inst. v. Walker,*
450 F.3d 1082 (10th Cir. 2006)......................................................47, 48

*Island Creek Coal Co. v. Lake Shore, Inc.,*
832 F.2d 274 (4th Cir. 1987)...............................................................44

*Katyle v. Penn National Gaming, Inc.,*
637 F.3d 462 (4th Cir. 2011)...............................................................31

*King v. Rubenstein,*
   825 F.3d 206 (4th Cir. 2016).................................................................... 2

*Laber v. Harvey,*
   438 F.3d 404 (4th Cir. 2006) (en banc) ............................................... 30

*Lopez v. Candaele,*
   630 F.3d 775 (9th Cir. 2010)................................................................. 51

*Matrix Capital Management Fund, LP v. Bearing-Point, Inc.,*
   576 F.3d 172 (4th Cir. 2009)........................................................... 31, 34

*Mayfield v. National Association for Stock Car Auto Racing, Inc.,*
   674 F.3d 369 (4th Cir. 2012)................................................................. 45

*McConnell v. Federal Election Commission,*
   540 U.S. 93 (2003) .......................................................................... 47, 48

*North Carolina Right to Life, Inc. v. Bartlett,*
   168 F.3d 705 (4th Cir. 1999)................................................................. 50

*Phillips v. LCI International, Inc.,*
   190 F.3d 609 (4th Cir. 1999)................................................................. 40

*Pittston Co. v. United States,*
   199 F.3d 694 (4th Cir. 1999)................................................................. 34

*Plumhoff v. Rickard,*
   134 S. Ct. 2012 (2014) ......................................................................... 53

*Quince Orchard Valley Citizens Association, Inc. v. Hodel,*
   872 F.2d 75 (4th Cir. 1989)................................................................... 32

*Ronzani v. Sanofi S.A.,*
   899 F.2d 195 (2d Cir. 1990) ................................................................. 33

*Rothamel v. Fluvanna County, Virginia,*
   810 F. Supp. 2d 771 (W.D. Va. 2011)................................................... 50

*Schlup v. Delo,*
   513 U.S. 298 (1995) .............................................................................. 33

*Scott v. Family Dollar Stores, Inc.*,
   733 F.3d 105 (4th Cir. 2013)................................................................ 34

*Secretary of State of Maryland v. Joseph H. Munson Co.*,
   467 U.S. 947 (1984) ............................................................................... 51

*Smith v. Barry*,
   502 U.S. 244 (1992) ............................................................................... 37

*South Walk at Broadlands Homeowner's Association v.*
   *OpenBand at Broadlands, LLC*,
   713 F.3d 175 (4th Cir. 2013)................................................................ 46

*Space Technology Development Corp. v. Boeing Co.*,
   209 Fed. App'x 236 (4th Cir. 2006) ..................................................... 40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................... 46

*Triplett v. LeFlore County, Oklahoma*,
   712 F.2d 444 (10th Cir. 1983)............................................................. 34

*United States ex rel. Bledsoe v. Community Health Systems, Inc.*,
   501 F.3d 493 (6th Cir. 2007)............................................................... 33

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008)............................................................... 31

*Virginia Society for Human Life, Inc. v.*
   *Federal Election Commission*,
   263 F.3d 379 (4th Cir. 2001)............................................................... 49

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................... 48

*York Group, Inc. v. Wuxi Taihu Tractor Co.*,
   632 F.3d 399 (7th Cir. 2011)............................................................... 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) ............................................................................... 31

## Statutes

28 U.S.C. § 1291 .................................................................... 3

28 U.S.C. § 1331 .................................................................... 3

## Rules

Federal Rule of Appellate Procedure 4(a)(1)(B) .................................... 3, 4

Federal Rule of Civil Procedure 8(a)(2) ....................................... 21, 22, 52

Federal Rule of Civil Procedure 10(c) ............................................ 39

Federal Rule of Civil Procedure 15(a) .......................................... 31, 32, 5

Federal Rule of Civil Procedure 59(e) ............................................ *passim*

Federal Rule of Civil Procedure 60(b) ............................................ *passim*

## Other Authorities

Mark Andrews,
    *Duties of the Judicial System to the Pro Se Litigant,*
    Alaska L. Rev. 189 (2013) ................................................... 35

Stephan Landsman, *The Growing Challenge of Pro Se Litigation,*
    13 Lewis & Clark L. Rev. 439 (2009) ................................... 36

Hon. Beverly W. Snukals & Glen H. Sturtevant, Jr.,
    *Pro Se Litigation: Best Practices from a Judge's Perspective,*
    42 U. Rich. L. Rev. 93 (2007) ............................................. 35

Donna Stienstra, et al., Federal Judicial Center, *Assistance to Pro Se
    Litigants in U.S. District Courts: A Report on Surveys of Clerks of
    Court and Chief Judges* (2011) ...................................... 36, 37

Jefri Wood, Federal Judicial Center, *Pro Se Case Management
    for Nonprisoner Civil Litigation* (2016) .......................... 35, 37

https://www.citybarjusticecenter.org/projects/federal-pro-se-legal-
    assistance-project/ ....................................................... 36

United States Courts, *Pro Se Centers Help Even the Odds for Litigants Without Lawyers*, Aug. 20, 2015, at http://www.uscourts.gov/news/2015/08/20/pro-se-centers-help-even-odds-litigants-without-lawyers ........................................................... 37

# INTRODUCTION

This appeal raises important questions about access to the judicial system for pro se litigants and how a trial court must consider a pro se litigant's good-faith attempt to cure perceived deficiencies in his complaint. In this case, the district court denied William Bond's efforts to fix what the court had specified as deficiencies in his pro se complaint. Twice the district rejected Bond's effort to amend his complaint—both times without any explanation. The district court's rejection of the amended complaints—without any explanation of why the added factual allegations were insufficient—was an abuse of discretion.

Importantly, the district court disregarded its obligation under *Foman v. Davis*, 371 U.S. 178 (1962). There, the Supreme Court instructed that the "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id.* at 182. This alone is sufficient to vacate the trial court's dismissal and to remand for further consideration of Bond's second amended complaint.

More broadly, the present appeal illustrates the errors a trial court too frequently commits when adjudicating a pro se litigant's claims. The Supreme Court and this Court have repeatedly cautioned that "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quotation omitted); *accord Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). The trial court did not heed this requirement. It instead set the bar too high for a non-lawyer litigant. Rather than "liberally construing" Bond's second amended complaint, the district court judge accused Bond of having an "intent on draining the Federal Judiciary of our limited resources." JA105 (quotation omitted). The district court judge also thought Bond's "repeatedly unmeritorious supplications are squandering the Third Branch's limited resources." JA416.

This appeal involves allegations the trial court, no doubt, found uncomfortable. Bond raised serious allegations of First Amendment violations, improper surveillance, substantial harassment, due process transgressions, and other questionable conduct by law enforcement

officers and members of the judiciary. It is, of course, premature to know whether the allegations will be proven true. But, at this procedural juncture, the trial court must accept Bond's allegations as true. When the second amended pro se complaint is viewed under the correct liberal standard, Bond has advanced plausible constitutional violations that warrant adjudication through discovery.

## JURISDICTIONAL STATEMENT

This is an appeal from the district court's denial of a motion under Rule 60(b) of the Federal Rules of Civil Procedure, filed after the final judgment of the United States District Court for the District of Maryland. The district court had subject matter jurisdiction over the civil action based on 28 U.S.C. § 1331. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Final judgment was entered by the district court on April 12, 2017. JA107. The district court denied the post-judgment motions under Rules 59(e) and 60(b) on May 23 and August 1, 2017, respectively. JA270; JA415–416. The notice of appeal was filed on September 29, 2017. JA417–418. Therefore, this appeal timely challenges the district court's denial of the Rule 60(b) motion seeking leave to file the second amended complaint. *See* Fed. R. App. P.

4(a)(1)(B). This appeal is from a judgment of the district court that disposed of all parties' claims.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether the district court abused its discretion in denying Bond's Rule 60(b) motion to reopen his action and grant him leave to file his second amended complaint, including his count alleging a First Amendment violation, when the trial court failed to provide any relevant explanation of why the additional factual allegations, including sixteen new exhibits attached to the second amended complaint, did not overcome the perceived deficiencies in the original complaint.

## CONCISE STATEMENT OF THE CASE
## AND FACTUAL BACKGROUND

### I. Procedural Background

On July 29, 2016, Appellant William C. Bond filed a civil action containing six counts. JA005–036. The complaint named as defendants Johnny L. Hughes, Kevin Perkins, Rod J. Rosenstein, and "Unknown Named Maryland U.S. Judges." JA005. On December 8, 2016, Bond filed a Motion to Stay and/or Toll Plaintiff's Opposition to the Defendant's Forthcoming Response to the Complaint. JA037–038. In response, on December 13, 2016, the named defendants filed a Motion to Substitute

and to Dismiss.   JA039–053.   Bond also filed a motion for discovery, JA054–074, which the defendants opposed, JA075–078.

On April 12, 2017, the district court ruled on the motion to dismiss, granting the defendants' request.   JA079–108.[1]  The district court further ordered the clerk to remove the case from the docket.   JA106.

On May 9, 2017, Bond then filed a motion to reopen the case and to file an amended complaint under Federal Rule of Civil Procedure 59(e). JA109–269.   The amended complaint included three counts, named different defendants, and included sixteen exhibits not included in the original complaint.  *Id.*

Two weeks later, on May 23, 2017, the district court denied the motion in a one-page order containing no analysis of the additional factual allegations in the first amended complaint.   JA270.   The district court denied the motion before the defendants filed any opposition.  *See* JA003.

---

[1] The civil action had been assigned to the Honorable David A. Faber, Senior District Judge of the Southern District of West Virginia.  *See* JA002 (ECF No. 4).

Bond then filed a second motion to reopen and file a second amended complaint on June 20, 2017. JA271–361; JA195–268. The second amended complaint again contained new factual allegations and further named three additional defendants. *Id.* This time, the government defendants did oppose the motion to amend, JA362–369, and Bond filed a reply in support of his second motion, JA370–414. The district court again denied the motion, this time with a two-page order that contained no substantive analysis of the second amended complaint. JA415–416. The court also barred Bond from making any additional filings. JA416. Bond then filed his notice of appeal on September 29, 2017. JA417–418.

## II.  Factual Background

### A.  William Bond Has Engaged in a Years-Long Effort to Expose What He Sees as Corruption in the Baltimore Judiciary and Law Enforcement Community

Bond has engaged in a years-long effort to expose certain conduct that he sees as corruption by the judiciary and law enforcement in Baltimore. JA080; JA302–318.[2]  Bond's advocacy stems from his

---

[2] The factual background summarized here is based on the factual allegations contained in Bond's second amended complaint.

negative litigation experience, which ultimately is grounded in a dispute concerning his unpublished fictional manuscript. JA302.[3] In many respects, the facts surrounding Bond's litigations and protest campaign are quite extraordinary.

Bond's protest actions partially trace to his arrest for possession of a handgun. JA303–304. In May 2001, Bond's home was raided by a Maryland State Police SWAT team, and he was arrested and charged with illegal handgun possession. JA303. He spent a night in the Baltimore jail. *Id.* Bond was arrested based, in part, on the fact that his former juvenile attorney had failed to expunge Bond's juvenile record. JA304–305.

Bond's juvenile attorney, Gerald Messerman, incorrectly informed Bond that his juvenile record had been expunged. JA303; JA239–242. This erroneous legal advice caused Bond to be at risk of serving a ten-year prison sentence for a misdemeanor. *See* JA304. The criminal case against Bond was ultimately dismissed after an expert forensic

---

[3] One prior appeal before this Court ruled directly on Bond's copyright infringement claim. *See generally Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003).

psychiatrist testified that Bond was mentally competent to possess a firearm.  JA306; JA227–229.

Around this same time, Bond was mired in a custody dispute concerning his ex-wife and her former husband.  JA304.  In both the custody case and the criminal case, counsel sought to use, as evidence against Bond, a manuscript Bond had written.  *Id.*  That manuscript had been obtained without Bond's permission.  *Id.*

The manuscript eventually became part of the public record, without Bond's permission.  Based on the unauthorized public disclosure of the manuscript, Bond took legal action, seeking the return of his property and an injunction against any further infringement of his intellectual property rights.  *Id.*  Represented by counsel, he sued several defendants for copyright infringement.  *Id.*; *see generally Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003).  The copyright case was litigated before U.S. District Judge Marvin J. Garbis.  JA304.  Judge Garbis ultimately ruled against Bond, and a panel of this Court, which included Judge Paul V. Niemeyer, affirmed and remanded for Judge Garbis to consider an award of additional attorneys' fees against Bond.  JA307.  On remand, Judge Garbis ordered Bond to pay more than $181,000 in fees.  *Id.*

During the litigation, Bond identified personal and financial relationships that undermined the perception of judicial impartiality. Bond learned that Judge Garbis had a personal relationship with Messerman, the juvenile attorney who misinformed Bond about the expungement of his criminal record. JA305. Bond also learned about a conversation Judge Garbis had with a prominent Baltimore lawyer in 2004–2006, during which Judge Garbis made "highly disparaging remarks" about Bond, JA308. Judge Garbis called Bond a "very bad man," said that Bond was "very dangerous," and warned the Baltimore attorney to "stay away" from Bond. *Id.*

Bond then sought to reopen his copyright case by filing a Rule 60(b) motion. JA310. Judge Garbis denied this motion. JA311.

Bond also filed what he has termed a Rule 60(b) "Independent Action." JA310–311. That action was assigned to U.S. District Judge J. Frederick Motz. JA310. Judge Motz ruled against Bond in that action. JA312. Bond viewed Judge Motz's decision as troubling because he was aware of information suggesting that Judge Motz had earlier expressed negative opinions about Bond. JA309. Specifically, Judge Motz had been the Chairman of the Board of Trustees of a hospital that Bond had

successfully sued for illegally releasing Bond's medical records. JA250; JA309. Bond had learned that Judge Motz was "adamantly outraged" that Bond sued the hospital for improperly disclosing his medical records. JA309. Judge Motz had ordered the hospital's attorney to "under no circumstances" settle with Bond. *Id.*

### B. The Present Dispute Stems from the Surveillance and Intimidation of William Bond by the FBI and the U.S. Marshals Service

Bond lost multiple efforts to reopen his copyright case, despite evidence speaking to judicial bias. JA306–319. Bond turned his efforts to learning more about what may have occurred behind the scenes, and he planned to protest against the insular Maryland judicial community. JA200–205; JA290–297.

In the summer of 2010, Bond met in person with Judge Niemeyer "to find out what the basis was for the denial of all his rights before Judge Niemeyer over many years." JA313–314; JA252–268. Bond left this meeting with a further sense that the system was stacked against him. Judge Niemeyer told Bond that his cases "should never have been brought" and that "they would never let him win." JA314.

Bond had also filed what he termed his "Bromwell FOIA" action to learn about other potential improprieties. JA311–313.[4] The Bromwell FOIA action sought to unseal documents from a criminal investigation related to Bond's copyright case. Judge Motz presided over the Bromwell FOIA action. JA312–313. During the Bromwell FOIA action, the federal prosecutors agreed, in part, with Bond that certain records should be unsealed. JA313. In the end, however, Judge Motz rebuffed Bond's efforts to require disclosure. *Id.*

Bond's other pro se actions were similarly detailed in his second amended complaint, all of which were his attempts to seek a satisfactory explanation about the various relationships involving Judges Garbis and Motz. For instance, Bond filed a recusal motion in August 2012. JA314. Bond also complained, to no avail, to the Chief Judge of the Fourth Circuit. JA315. All of his pro se efforts met dead-ends. He thus turned his energies to protesting.

---

[4] The second amended complaint included links to two published articles concerning the Bromwell FOIA action. *See* JA313. Those articles are also available online: http://thedailyrecord.com/2009/04/10/federal-prosecutors-willing-to-unseal-more-bromwell-docs/ and http://thedailyrecord.com/2009/07/17/bromwell-documents-to-remain-sealed/.

With the information he had gathered, Bond started planning public protests and a public advertising campaign. He wanted to publicize his unfair treatment and expose what he saw as judicial bias against his legal rights. JA315–316. He had experienced years of stress and financial and reputational ruin attributable to the failed legal actions. JA316–317.

His public campaign began with a series of newspaper advertisements centered on the slogan: "Is the 'White Guerrilla Family' running the Maryland federal court?" JA290. He had two advertisements seemingly depicting a white gorilla as representative of certain members of the Maryland federal judiciary. JA200–205. The color version is shown below:



JA200–205.  These advertisements began running in the newspaper in July 2013 and continued through the fall of the same year.  JA290

Bond also submitted an op-ed column to *The Baltimore Sun*. JA290; JA200–205.  The proposed op-ed column detailed Bond's views on the judicial bias and public corruption associated with his various litigations.  JA200–205.  While the op-ed column was not published, it was shared with and considered by *The Baltimore Sun* editors.  JA290.

Bond then announced his planned public protest at the "Baltimore U.S. Courthouse."  JA291.  He scheduled his protest for August 4, 2013. JA313.  At the protest, which he termed the "Baltimore Corruption Wire" demonstrations, he intended to publicize the misdeeds of the federal judiciary.

Shortly before his planned protest, Bond was detained at his home by two federal law enforcement officers, on two separate occasions, and interrogated about his upcoming protest.  JA289–299.  On July 19, 2013, without a warrant, Deputy U.S. Marshall Robert Mark Frederick and an FBI agent (Special Agent Chris Wood) contacted Bond at his residence. JA291–292.  Bond agreed to talk with the two officials even though he was under no obligation to do so.  JA291.

Wood "peppered [Bond] with questions regarding the potential safety of various government officials and federal judges, some of whom were former neighbors of [Bond], and one whose daughter used to babysit for [Bond's] stepchildren." JA292. Wood repeatedly asked what could be done to make the protest go away. *Id.* The questioning alarmed Bond because he had never physically threatened any judge or government official. *Id.* He explained that his goal was to seek a reprimand and sanctions against the officials because of the damage caused to him by Judge Motz and others. *Id.*

The next day, Bond wrote an email to the U.S. Attorney's office, JA207–209, because he was very concerned about "what had just been done to him by the government," JA292. In the email, Bond noted that "it is only within 2 days of a newspaper ad attacking your clients, the Maryland judiciary, that your officers show up at my door with the most phoney intimidation BS." JA207. His email further conveyed that he was "flat out told" by the law enforcement officers that he had "been under constant surveillance and electronic surveillance during 3 years of litigation" while Bond was suing government officials. *Id.*

Bond also explained that his goal was to hold Judge Motz accountable for what Bond saw as a corrupt decision. Bond wrote: "For your office to attempt to intimidate my First Amendment rights, but to attempt to influence my citizen's rights to hold corrupt governmental officers accountable is so outrageous, it is unprecedented in this state." JA208.

On July 30, 2103, Bond received a second visit from law enforcement—this time from Frederick and FBI Agent Patrick S. Dugan. JA293.[5] Frederick and Dugan demanded Bond's firearms, but Bond explained that he had none. JA293. The agents also searched Bond's physical person. JA294 ("Plaintiff even had to stand up, raise his shirt, and turn around to show the agents that he had no handguns on his person.").

The questioning and physical search occurred despite the agents lacking a search warrant. *Id.* Bond also explained that his firearms had

---

[5] The second amended complaint alleges that Judge Motz ordered Frederick and Dugan to interrogate Bond. JA295. Frederick was the supervisor of the U.S. Marshals Service's Office of Protective Intelligence, and Dugan was the head of the Baltimore Field Office's Violent Crimes Unit. JA293.

been confiscated during the 2001 criminal action that was later dismissed and expunged from his record. *Id.* Without any written support, the agents claimed that "the state gun database still showed [Bond] owning firearms." *Id.*

In addition to the questioning and search relating to the nonexistent firearms, the agents again interrogated Bond about his planned protest. JA295. Dugan "asked—holding some of [Bond's] 'White Guerrilla Family' promotional literature in his hand—'What would it take to make this [the planned demonstrations] go away?'" *Id.* Bond was warned that, if the agents found him in possession of firearms, they would return and "slap the bracelets on his wrists and take him straight to Central Booking." JA295–296. Bond was left with the strong impression that the agents would arrest him if he continued with his public protests as planned. JA318.[6]

In light of the intimidation from law enforcement officials, Bond's ability to conduct his protest against judicial corruption was adversely affected. JA298; JA301–302; JA318. He suffered from great worry,

---

[6] As the complaint explains, Bond was legally permitted to possess firearms in 2013. JA297–298.

anxiety, fear, and sleeplessness. JA301–302. He believed that "the federal officials who had wronged him would stop at nothing to defeat his constitutional rights." JA302. He believed that the agents had tried to arrest him for handgun possession but were unable to do so. JA298; JA318.

The law enforcement visits diluted Bond's demonstration planning and "curb[ed] the robustness of his speech/protest and execution." JA318. Bond was left with the impression that the law enforcement agents "were trying to make [his] planned demonstrations go away by any means possible." *Id.*

In light of the law enforcement interrogations, Bond "was forced to consult a criminal defense lawyer, other lawyers and business people, [and] numerous friends." JA296. He worried about the consequences, lost "much sleep," and was "greatly distracted when he was on an abbreviated time line and had much to still do to organize" the protest. JA296–297.

On August 4, 2013, Bond, under duress, held his muted protest at the Baltimore U.S. Courthouse. JA300; JA318. During that protest and future protests, Bond talked with Agent Frederick. JA300–301.

- 17 -

Frederick revealed to Bond that Bond had been under surveillance since 2010, which surprised Bond. JA301. In view of this revelation, Bond was "forced to limit and curtail the freedom of his expression to others via the telephone, the internet, and by other means, from 2013 forward." *Id.*

## C. Bond's Original Pro Se Complaint Contained Six Counts, Including Claims Based on *Bivens*, the First and Second Amendments, and Due Process

In July 2016, after living through what he saw as a continuing pattern of improper conduct, Bond filed a pro se complaint in the district court containing six causes of actions. JA005–027. Doing the best he could, Bond provided a detailed account of the relevant events, explaining the history that led up to the filing of the complaint. *See id.*

## D. The District Court Dismissed Bond's Complaint for Failure to State a Claim

In December 2016, the Government moved to dismiss the complaint based on Rules 12(b)(1) and 12(b)(6). JA041–053.[7] The Government asserted that: (a) the original complaint failed to state a *Bivens* claim against the defendants in their individual capacities; (b) Bond lacked

---

[7] At the time of the Government's motion, the named defendants were Johnny L. Hughes, Kevin Perkins, and Rod Rosenstein. JA041. The Government moved to substitute the United States as the sole defendant in place of the three named defendants. JA050.

standing to bring his First Amendment claim because he purportedly had not self-censored his speech; (c) the complaint failed to state a due process violation; and (d) the defendants are entitled to qualified immunity because Bond failed to "articulate[] how any named Defendants violated his constitutional rights." JA049.

Bond opposed the motion. JA054–074. Bond first argued that the Government's opposition improperly relied on information outside the complaint and that discovery was necessary to respond to the Government's factual assertions. JA055–056. Specifically, Bond identified the Government's contention that "[t]he underlying basis for the interviews was concern about the safety of federal judges and other government officials" as not being anywhere in the complaint. JA056 ("[P]laintiff's complaint at ¶¶ 29, 40, nor or [sic] at any other part, makes no mention of any threat against any federal official.").

Bond also challenged the Government's reliance on its assertion that the complaint did not include an allegation that "the government conducted electronic surveillance of Plaintiff's home telephone without first obtaining a warrant." JA056. Bond argued that he would need discovery to assess the validity of any such warrant, if it had issued, and,

more importantly, that "it is a *prima facie* due process violation for the government to surveil a party while litigation is ongoing." JA057. Bond also argued that he would need discovery to respond to an affidavit the Government submitted to support its motion to dismiss. *Id.*

After briefing, the district court granted the Government's motion to dismiss. JA075–108.[8] First, the district court ruled that Bond had failed to state a *Bivens* claim against any of the named defendants. JA091. The court observed that "[t]he body of the Complaint fails to identify SAC Perkins and Marshal Hughes," who were the only two defendants identified by name (other than Rod Rosenstein). *Id.* The court also explained that "*Bivens* does not permit respondeat superior liability." *Id.*[9]

Next, the court held that Bond lacked standing to bring his First Amendment claim because he purportedly "furnished th[e] court with no

---

[8] The district court's opinion addressed the *Bivens* action, each of the six counts of the original complaint, and qualified immunity. We discuss herein only those aspects of the court's opinion that are relevant to the present appeal.

[9] Note that the district court copied essentially verbatim the Government's brief regarding the *Bivens* claim. *Compare* JA046 *with* JA091.

- 20 -

evidence of a chilling effect on his speech." JA094. According to the district court, Bond provided "no evidence that his speech was chilled or that he self-censored himself." JA095.

The trial court also rejected Bond's due process violations, as they relate to each of the counts. For Count I, the court held that Bond's First Amendment count "must be dismissed for both Rule 12(b)(6) and Rule 8(a)(2) deficiencies." JA098. The complaint, in the court's view, "glosse[d] over" the "legitimate possibility" that the law enforcement visits could have also been conducted for legitimate reasons. JA099.

For Count VI, the court rejected the due process allegations because the allegations of improper governmental surveillance implicated the Fourth Amendment, not due process. JA101. The court did not analyze whether the allegations stated a plausible Fourth Amendment violation. Instead, the court merely stated that "once again Plaintiff states only 'conclusory' allegations that are grounded solely in conjecture and speculation without any basis in fact" and referred the earlier analysis for Count I. *Id.*

For Count VI, the court stated: "Plaintiff does not assert a cognizable legal right this alleged conspiracy actually violates" and, "[f]or

reasons materially indistinguishable from the ones already given in the earlier analyses, Count VI must be dismissed for both Rule 12(b)(6) and Rule 8(a)(2) deficiencies." JA103.

Finally, the court concluded that the named defendants—specifically, Johnny L. Hughes, Kevin Perkins, and Rod Rosenstein—were subject to qualified immunity because Bond "had not expressed how any named Defendants trampled on his constitutional rights." JA104. The court dismissed the action and directed the clerk "to remove this case from the court's docket." JA107.

### E. Bond Sought to Amend His Complaint to Cure the Deficiencies the District Court Identified in Its Dismissal Order

Attempting to cure the deficiencies in his original complaint, Bond filed a motion to reopen the case and for leave to file a first amended complaint. JA109–110. The motion was supported with a memorandum of legal points, along with sixteen exhibits. JA111–269. Bond filed the motion pursuant to Federal Rule of Civil Procedure 59(e). JA109. The redlined version of the first amended complaint showed substantial

additional factual allegations supporting Counts I, III, and VI of the original complaint.[10]

Despite the additional factual allegations, including the newly named defendants, the district court tersely denied leave to file the amended complaint, even before the Government had an opportunity to respond to the motion. JA270. Judge Faber's order did not address any of the additional factual allegations that Bond included in his amended complaint. *Id.* Nor did Judge Faber address the numerous exhibits attached to the first amended complaint. *Id.* In fact, Judge Faber's order provides only a single sentence that might be considered analysis: "For reasons expressed in the Memorandum Opinion and Order and Judgment Order already filed, see Doc. Nos. 22—23, the court hereby DENIES Plaintiff's Motion to Reopen Case and to File an Amended Complaint." *Id.*

---

[10] Bond had dropped Counts II, IV, and V from the first amended complaint. *See* JA130.

**F.     Without Any Explanation, The District Court Denied Bond's Second Attempt to Amend His Complaint, Even Though Bond Added Substantial New Factual Allegations and Included Sixteen Exhibits**

Continuing as a pro se litigant, Bond next filed another motion with the district court, for leave to file a second amended complaint. JA271–272. He filed this second motion pursuant to "Fed. R. Civ. P. 59(e) and/or Fed. R. Civ. P. 60(b)." JA271.[11] As with his first motion, he filed a memorandum in support of the motion, along with sixteen exhibits. JA273–361; JA195–269.[12]

As before, Bond included a redline version of the proposed amended complaint showing the substantial changes between the original complaint and the second amended complaint. JA320–361. The second amended complaint was limited to Counts I, III, and VI. JA299. The additional allegations supporting those counts included several critical

---

[11] Footnote 1 in Bond's second motion illustrates Bond's reasonable misunderstanding that he could file successive Rule 59(e) motions and continue to toll the time to appeal the district court's final judgement. *See* JA271. Indeed, that issue has tripped even litigants represented by counsel. *See, e.g.*, *York Group, Inc. v. Wuxi Taihu Tractor Co.*, 632 F.3d 399, 401 (7th Cir. 2011).

[12] Exhibits 1-16 attached to the second amended complaint are identical to Exhibits 1-16 attached to the first amended complaint. The joint appendix here includes only one set of Exhibits 1-16, at JA195–269.

facts that were not included in the original complaint or the first

amended complaint.  For instance, including:

> 1) FBI Agent Dugan "asked—holding some of [Bond's] 'White Guerrilla Family' promotional literature in his hand—'What would it take to make this [the planned demonstrations] go away?'" JA295.

> 2) "[J]ust two (2) days after plaintiff's first *City Paper* ads— ads which received much notice in Baltimore—the law enforcers suddenly found exigent reasons to attempt to intimidate and influence plaintiff's First Amendment rights." JA296.

> 3) "For example, because of this first visit by the law-enforcers, plaintiff was forced to consult a criminal defense lawyer, other lawyers and business people, numerous friends, to worry and lose much sleep, and to be greatly distracted when he was on an abbreviated time line and had much still to do to organize the August 4, 2013, protests, amongst many other things."  JA296–297.

> 4) "This worry and distraction chilled and curtailed the robustness of plaintiff's [F]irst [A]mendment activity—as one would expect following visits from interrogating law enforcement personnel asking, 'What will it take to get you to shut up?'"  JA297.

> 5) Paragraph 36 of the second amended complaint, which includes: "This second visit caused plaintiff the same injuries and curtailed speech as just recounted above, only they were exacerbated, as plaintiff now only had five (5) days left before his first protest at the Baltimore U.S. Courthouse."  JA297.

> 6) "Further, it doesn't matter that the defendants were unable to arrest plaintiff on July 30, 2013.  What matters is that they tried.  Just as they tried and succeeded in diluting plaintiff's demonstration planning and to curb the robustness of his

- 25 -

speech/protest and execution. Clearly, their reasons were that they were trying to make plaintiff's planned demonstrations go away by any means possible. By any means." JA318.

The second amended complaint also contained additional allegations relating to the due process violations. For instance, the second amended complaint expressly named Judges Garbis, Motz, and Niemeyer as defendants. JA320–321. Many of the details discussed above, which form the foundation of Bond's planned public protest campaign, were included for the first time in the second amended complaint. *See* JA303–318.

Unlike with the first motion to amend, the Government filed an opposition to Bond's second motion to amend, JA362–369, and Bond filed a reply, which included eleven additional exhibits, JA370–414. The Government's opposition provided only limited argument and did not specifically address the new factual allegations. The Government repeated its argument that Bond lacked standing under the First Amendment, this time including a block-quote of two paragraphs from the district court's original dismissal order. *See* JA365 (quoting JA093–095). The Government's reply next addressed the due process claim by block-quoting five paragraphs from the court's earlier order. *See* JA366–

367 (quoting JA098–101). Finally, the opposition addressed the Second Amendment violation. JA367. The Government's opposition did not respond to the specific new factual allegations included in the second amended complaint. *See* JA362–369. Beyond a footnote, the Government's opposition neither addressed the newly named defendants, who were not named in the original complaint, nor argued that they were entitled to qualified immunity. *Id.*

Notwithstanding the added factual allegations, as well as Bond's reasoning set forth in his memorandum and reply, the district court denied the motion without any explanation, other than referring to the earlier-entered orders:

> For reasons expressed in the Memorandum Opinion and Order and Judgment Order already filed, see Doc. Nos. 22—23, and in the Order denying the re-opening of this case, see Doc. No. 25, yet again the court DENIES Plaintiff's Motion to Reopen Case and to File an Amended Complaint.

JA415.

Instead of explaining why the additional allegations fell short under Rules 8(a) and 12(b)(6), Judge Faber scolded Bond for attempting to improve his pro se complaint:

> Plaintiff already has been "admoni[shed]" that "[he] should take care not to lose credibility by filing vexatious and

frivolous complaints." Doc. No. 25. This is because "every paper filed with the Clerk of this [c]ourt, no matter how repetitious or frivolous, requires some portion of the institution's limited resources. A part of the [c]ourt's [stewardship] responsibility is to see that these resources are allocated in a way that promotes the interests of justice." *In re McDonald*, 489 U.S. 180, 184 (1989) (per curiam); *see also Martin v. District of Columbia Court of Appeals*, 506 U.S. 1, 1 (1992) (per curiam) (applying this principle to "notorious abuser[s]" of the judicial system). This is the second time that Petitioner has asked the court to re-open this case. The court has again refused to do so. Petitioner's repeatedly unmeritorious supplications are squandering the Third Branch's limited resources; the aggregation principle informs the court that were Petitioner's conduct repeated on a nationwide scale, the work of the Federal Judiciary might come to a grinding halt. Additionally, Petitioner's conduct is damaging his own interests.

JA415–416. Judge Faber further ordered that "[t]he Clerk is directed not to accept any further motions to vacate the court's opinion and order or to reopen this action." JA416.

This appeal follows.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion for several reasons. First, the district court failed to consider the additional allegations in the second amended complaint, and the district court did not provide any justification for denying Bond's motion to file his amended complaints. The reflexive dismissal—without any substantive justification of why the

second amended pro se complaint should not be entered under the liberal application of Rule 15—is by itself sufficient to hold that the trial court abused its discretion.

Second, the amendments to the complaint demonstrate that the second amended complaint was not futile, and it would cure any perceived deficiencies with the original complaint. Bond credibly alleged that federal law enforcement agents threatened to arrest him, that the threatened arrests were linked to Bond's public protest and advertising campaign against the federal judiciary, and that Bond self-censored his protests in response to the threats. Bond should be given the opportunity to litigate the merits of his claim.

This Court has repeatedly recognized that threatened law enforcement action that chills First Amendment-protected speech can constitute a First Amendment violation. *See generally Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013). Even self-censoring in response to government surveillance can establish standing to sue under the First Amendment. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 211 (4th Cir. 2017).

Just as importantly, the district court failed to liberally construe the second amended complaint. It was a pro se complaint, written without the benefit of legal training, trying to explain why Bond self-censored his protest in response to the threatened arrest by law enforcement. Moreover, this Court has instructed that "standing requirements are somewhat relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 235. The district court's rulings against Bond fail to apply the relaxed requirements for a pro se First Amendment claim.

The district court's refusal to provide any explanation for its dismissal cannot be condoned. To do so would run counter to settled precedent. It would send the wrong message to pro se litigants who cannot afford counsel.

## ARGUMENT

### I.   Standards Of Review

A district court may not grant a post-judgment motion to amend a complaint unless the judgment is set aside or vacated pursuant to Federal Rule of Civil Procedure 59(e) or 60(b). *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc) (internal quotation marks omitted). "To determine whether vacatur is warranted, however, the court need not

concern itself with either of those rules' legal standards.  The court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a)." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011).  "In other words," as this Court has explained, "a post-judgment motion to amend is evaluated under the same legal standard as a similar motion filed before judgment was entered—for prejudice, bad faith, or futility." *Id.*; *accord Katyle*, 637 F.3d at 471 (4th Cir. 2011); *Matrix Capital Mgmt. Fund, LP v. Bearing-Point, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009).

Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards: "[A] district court may deny leave if amending the complaint would be futile— that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (internal quotation marks omitted).

The review of a district court's decision to allow or deny amendments to a complaint is governed by the abuse of discretion standard. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321,

330 (1971). This Court's "policy [is] to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)." *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010).

A district court abuses its discretion "by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989) (internal quotation marks omitted).

## II.   The District Court Abused Its Discretion When It Denied, Without Any Justification, The Second Motion To Amend The Complaint

The district court abused its discretion when it denied, without explanation, Bond's second motion to amend his complaint. The district court's lack of any relevant justification for denying the motion is sufficient grounds by itself for reversing and remanding this case to the district court.

### A.   A Trial Court Abuses Its Discretion When It Ignores The Substance of New Allegations in a Pro Se Motion to Amend

Precedent is clear that a trial court must consider the substance of a proposed amended complaint and must provide a justification for denying entry of the amended complaint. A court cannot simply deny a

pro se litigant's attempt to cure defects in his complaint, without providing an explanation of why the proposed amended complaint allegedly falls short

In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Supreme Court instructed that the "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *See also Schlup v. Delo*, 513 U.S. 298, 348 (1995) (Scalia, J., dissenting) ("Here as elsewhere in the law, to say that a district judge may not abuse his discretion is merely to say that the action in question (dismissing a successive petition) may not be done without considering relevant factors and giving a justifying reason.").

Following *Foman*, the courts of appeals have consistently held that denying leave to amend a complaint without providing an explanation for the denial is an abuse of discretion. *See, e.g., United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 521 (6th Cir. 2007) (reversing because "[t]he district court gave no reason for dismissing" the second amended complaint); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (reversing denial of offer to amend complaint because the

district court "gave no reason for denying it"); *DCD Programs Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) ("[I]n the absence of written findings or a record which clearly indicates reasons for the district court's denial, this court will reverse a denial of leave to amend."); *Triplett v. LeFlore Cty., Okl.*, 712 F.2d 444, 447 (10th Cir. 1983) (reversing dismissal because the district court did not set forth any "justifying reasons for the denial of leave to amend"); *Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1153 (5th Cir. 1981) ("We have previously indicated the disfavor with which we view district court denials of amendments without stated reasons." (citing *Griggs v. Hinds Junior College*, 563 F.2d 179 (5th Cir. 1977))).

This Court has repeatedly cited with approval *Foman*'s admonition that a district court cannot deny leave to amend without an explanation. *See, e.g.*, *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 121 (4th Cir. 2013); *David v. Alphin*, 704 F.3d 327, 343 (4th Cir. 2013); *Equal Rights Center v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010); *Matrix Capital Mgmt.*, 576 F.3d at 194; *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 391 (4th Cir. 2005); *Pittston Co. v. United States*, 199 F.3d 694, 705 (4th Cir. 1999).

Requiring a district court to actually consider the allegations of an amended complaint is all the more important in a pro se case. The complexity of modern civil litigation makes it particularly challenging for non-lawyers to understand pleading requirements and other procedural rules. Even with the complexity, a pro se litigant must still be afforded the due process of full evaluation by the court. *See* Mark Andrews, *Duties of the Judicial System to the Pro Se Litigant*, Alaska L. Rev. 189, 193 (2013) ("Due process protects the right to self-representation from arbitrary denial. It ensures a pro se litigant's claim will be heard despite a litigant's potential lack of familiarity with procedure."); Hon. Beverly W. Snukals & Glen H. Sturtevant, Jr., *Pro Se Litigation: Best Practices from a Judge's Perspective*, 42 U. Rich. L. Rev. 93, 98 (2007) ("Judges . . . must balance considerations of fairness to represented parties with due process requirements mandating that pro se litigants receive meaningful hearings.").

The difficulties pro se litigants face are well known and well-studied, yet practical solutions are hard to come by. *See, e.g.*, Jefri Wood, Federal Judicial Center, *Pro Se Case Management for Nonprisoner Civil Litigation* at vii (2016) ("At approximately 25,000 per year, nonprisoner

pro se filings make up a significant portion of the federal civil caseload and present their own challenges in a system geared toward both parties being represented by attorneys." (footnote omitted)); Donna Stienstra, et al., Federal Judicial Center, *Assistance to Pro Se Litigants in U.S. District Courts: A Report on Surveys of Clerks of Court and Chief Judges* at vi (2011) ("Although the clerks' offices have taken a number of steps to assist pro se litigants and to make it easier for court staff to handle this portion of the caseload, the clerks identified a number of issues that remain unresolved or that lie ahead."); Stephan Landsman, *The Growing Challenge of Pro Se Litigation*, 13 Lewis & Clark L. Rev. 439, 400 (2009) ("Today, America's courts appear to be facing an inexorably rising tide of pro se litigation.").

Some courts are implementing procedures to ensure that pro se litigants receive their fair day in court. For instance, in 2015, the Pro Se Legal Assistance Project was started in the U.S. District Court for the Eastern District of New York to assist pro se litigants.[13] "The goal of this program is to provide much needed legal assistance to our pro se

---

[13]     https://www.citybarjusticecenter.org/projects/federal-pro-se-legal-assistance-project/

community," said Chief Judge Carol B. Amon.[14]   Other courts have undertaken similar efforts. *See also* Wood, *supra*, at viii ("The Federal Judicial Center has taken several steps in recent years to assist the federal courts in meeting the challenges of handling claims of pro se litigants."); *see generally* Stienstra*, supra* (describing various programs and procedures implemented by courts to address the problems with pro se litigation).

It is uncertain whether these and other efforts will substantially improve the judicial system for litigants who are unable to afford to hire an attorney.  Until improvement is shown, though, courts must continue to "liberally construe" the pleadings of a pro se plaintiff in order to achieve fairness in a complex legal system. *See Foman*, 371 U.S. at 181–182; *Smith v. Barry*, 502 U.S. 244, 248 (1992).  For the reasons explained below, the district court did not abide by this requirement to liberally construe a pro se complaint to ensure that every litigant receives his or her "fair shake."

---

[14] United States Courts, *Pro Se Centers Help Even the Odds for Litigants Without Lawyers*, Aug. 20, 2015, at http://www.uscourts.gov/news/2015/08/20/pro-se-centers-help-even-odds-litigants-without-lawyers

**B.    The District Court Gave No Consideration to the Additional Allegations Relating to the First Amendment Violations**

Here, the trial court abused its discretion because it denied Bond's motion to file a second amended complaint.  The court gave no explanation of why Bond's additional First Amendment allegations were insufficient, other than referring to its order dismissing the original complaint.

Whether the district court realized or not, the second amended complaint added specific allegations about how the actions of the government officials chilled his speech and adversely affected his ability to conduct a rigorous protest of what he sees as judicial corruption. Specifically, Bond's additional allegations demonstrate an objectively reasonable chilling of his speech and his planned protest.  According to the allegations, Special Agent Dugan asked, while holding Bond's inflammatory "White Guerilla Family" promotional literature, "What would it take to make this [the planned demonstrations] go away?" JA295.  Bond further had to "consult a criminal defense lawyer, other lawyers and business people, [and] numerous friends" because of his concern about the threats from law enforcement.  JA296.  Bond suffered "worry and los[t] much sleep."  *Id.*  The actions of the government law

enforcement officials caused "worry and distraction [that] chilled and curtailed the robustness of" Bond's planned protests. JA297. It is not surprising that Bond self-censored his expression, particularly when law enforcement asked him, "What will it take to get you to shut up?" *Id.*

The district court further abused its discretion by not considering the numerous exhibits attached to the second amended complaint. Bond attached sixteen exhibits to his first and second amended complaints. *See* JA195–269.[15] Under the applicable rules, these attachments should have been deemed to be part of the operative complaint. *See* Federal Rule of Civil Procedure 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) ("It would seem to follow [from Rule 10(c)] that if an attachment to an answer is a 'written instrument,' it is part of the pleadings."); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("Relying on Rule 10(c), we have held that the complaint is deemed to include any written

---

[15] Exhibits 1-16 attached to the second amended complaint are identical to Exhibits 1-16 attached to the first amended complaint. Only one copy of the identical exhibits is included in the Joint Appendix at JA195–269.

instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *cf. Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (holding that a district court did not err by considering a document outside the pleadings that "was integral to and explicitly relied on in the complaint").

Indeed, this Court has explained that it "must also accept as true the facts set forth in the exhibits attached to the complaint." *Space Tech. Dev. Corp. v. Boeing Co.*, 209 Fed. App'x 236, 238 (4th Cir. 2006) (non-precedential). The fact that Bond was acting *pro se* at all times before the district court is all the more reason the district court should have considered the substance of the exhibits and provided an explanation of why those new exhibits did not cure any deficiencies identified earlier by the court. It would elevate form over substance if a trial court could ignore relevant allegations simply because they are contained in an exhibit, instead of the body of the complaint, particularly in the context of pro se litigation.

Bond also included as exhibits his graphic images of the "White Guerrilla Family" advertising. *See* JA196. This advertisement, along with the black-and-white version, was referenced repeatedly in the

second amended complaint and relates directly to the arguably offensive content—from the defendants' perspective—of Bond's intended protest. *See* JA290.  Bond explained that these graphics were part of his public relations campaign "protest[ing] the 'provable corruption' in the Maryland U.S. courthouse at the courthouse itself."  JA290.  Yet the district court did not acknowledge the advertisements as exhibits to the complaint.

In sum, the district court abused its discretion by not giving any consideration to the additional factual allegations supporting Bond's First Amendment claim in the second amended complaint.  This is sufficient to require reversal.  Moreover, and as explained below, the amendments to the second amended complaint were not futile, and Bond alleged a viable First Amendment injury caused by federal law enforcement agents.

### C.    The District Court Did Not Address the *Bivens* Claims Against the Newly Named Defendants

To the extent the district court's dismissal of the second amended complaint rests on its earlier *Bivens* analysis, the district court again abused its discretion.  Bond's second amended complaint named specific individuals who were not named as defendants in the original complaint.

The district court offered no analysis under *Bivens* with respect to these new defendants.

As noted above, Bond named Robert Mark Frederick of the U.S. Marshals Service and Patrick S. Dugan of the FBI in his second amended complaint. JA287.[16] The second amended complaint also named Judges Garbis, Motz, and Niemeyer. JA287–288.

Bond added the new defendants in direct response to the district court's order dismissing the original complaint. In its first order, the district court explained the deficiency concerning the *Bivens* claims: "The body of the Complaint fails to identify SAC Perkins and Marshal Hughes. The Complaint contains no content explaining how either of these Defendants may have violated Plaintiff's constitutional rights." JA091.

Bond took the district court's guidance to heart. He named Frederick and Dugan, instead of their presumed supervisors, as the

---

[16] Bond had also named Frederick and Dugan as defendants in his first amended complaint. *See* JA119. The district court similarly offered no consideration of these two newly named defendants when denying Bond's first motion to amend, instead simply referring to the memorandum and order dismissing the original complaint. *See* JA270 ("For reasons expressed in the Memorandum Opinion and Order and Judgment Order already filed . . . .").

defendants in the proposed first and second amended complaints. *See* JA287; JA281. At no point has the district court ever addressed the sufficiency of the allegations against Frederick or Dugan, or whether a *Bivens* claim was properly alleged against Frederick or Dugan.

In the second amended complaint, Bond also named the three judges as defendants. JA287–288; JA295; JA302–318. At no point has the district court addressed the sufficiency of the allegations against the identified judges. *See* JA079–106; JA415–416. The district court also did not assess whether the newly named defendants were protected by qualified immunity. *See* JA415–41.

\*   \*   \*

In conclusion, the district court adopted a preconceived notion that Bond's second amended complaint contained the same allegations as in the original complaint. Judge Faber ignored the additional factual allegations and provided no consideration or explanation as to why the second amended complaint allegedly falls short. That alone is sufficient for reversal. *See Foman*, 371 U.S. at 182. By sticking to its preconceived notion and not analyzing the new factual allegations, the trial court abused its discretion, and the dismissal should be reversed.

Furthermore, as explained below, Bond's second amended complaint advances plausible claims of a constitutional infringement.

## III. The Second Amended Complaint Alleges A Valid *Bivens* Action Under the First Amendment

Beyond the district court's refusal to properly consider the second amended complaint, the district court also erred because Bond's second amended complaint is not futile. Applying the proper standard, the second amended complaint included non-futile allegations of *Bivens* claims based on First Amendment violations.

"[W]hile the trial court is given discretion to deny amendment, that discretion is limited by the interpretation given Rule 15(a) in *Foman* and by the general policy embodied in the Federal Rules favoring resolution of cases on their merits." *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279 (4th Cir. 1987) (citation and quotation omitted). "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (quotation omitted).

"[A] request to amend should only be denied if one of three facts is present: the amendment would be prejudicial to the opposing party, there

has been bad faith on the part of the moving party, or amendment would be futile." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012). Here, the Government raised only futility as a basis for denying the motion to amend. *See* JA365; JA367.

The Rule 15(a) futility analysis requires an initial assessment of the allegations in the amended complaint based on the controlling substantive law. "Unless a proposed amendment may clearly be seen to be futile because of substantive or procedural considerations, conjecture about the merits of the litigation should not enter into the decision whether to allow amendment." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980) (citation omitted).

In assessing a proposed amended complaint's sufficiency, the familiar standard of Rule 12(b)(6) applies. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). Of course, "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quotation omitted).

### A.  Bond Properly Alleged Violations of His First Amendment Right to Protest Against the Maryland Judiciary

Bond's second amended complaint alleges a plausible First Amendment violation because his speech was chilled by the law enforcement agents who detained him, threatened him with arrest, and urged that his protest should "go away."  The district court erred when it held that Bond lacked standing because he had failed to establish an injury-in-fact.

### 1.  The Threshold Standing Requirement for a First Amendment Claim is More Liberally Construed

In reviewing the dismissal of a complaint, this Court must "assume all well-pled facts to be true" and "draw all reasonable inferences in favor of the plaintiff." *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013). "When addressing the appropriateness of dismissal for lack of standing," this Court "consider[s] exhibits attached to the complaint in addition to the complaint itself." *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013).  The Court "must also consider 'documents incorporated into the complaint by reference.'" *Cooksey*, 721 F.3d at 234 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

In the First Amendment context, the injury-in-fact element of the standing requirement is frequently satisfied by a showing of "self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (internal quotation marks omitted). This Court has explained:

> We have recognized that, to demonstrate injury in fact, it is sufficient to show that one's First Amendment activities have been chilled. Subjective or speculative accounts of such a chilling effect, however, are not sufficient. Any chilling effect must be objectively reasonable. Nevertheless, a claimant need not show [he] ceased those activities altogether to demonstrate an injury in fact. Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.

*Id.* (internal quotation marks, citations, and alterations omitted).

Moreover, when analyzing whether a plaintiff establishes standing to assert a First Amendment claim, the trial court must avoid "put[ting] the merits cart before the standing horse." *Cooksey*, 721 F.3d at 239 (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006)). Indeed, courts have routinely and correctly held that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *McConnell v. Fed. Election Comm'n*,

540 U.S. 93, 227 (2003) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

> ### 2. The Threats of Arrest by the Federal Law Enforcement Officers Chilled Bond's Planned Protests

Even assuming the district court considered the additional allegations in Bond's second amended complaint, the district court misapplied the law and put the cart before the horse. Bond's additional allegations demonstrate an objectively reasonable chilling of his speech and his planned protest. According to the allegations, Special Agent Dugan asked, while holding Bond's inflammatory "White Guerrilla Family" flyer, "What would it take to make this [the planned demonstrations] go away?" JA295. In the context of being interrogated by law enforcement, it is objectively reasonable to interpret this statement as having a chilling effect on Bond's planned protest.

Bond had to "consult a criminal defense lawyer, other lawyers and business people, [and] numerous friends" because of his concern about the threats from law enforcement. JA296. Bond suffered "worry and los[t] much sleep." *Id.* The actions of the government law enforcement officials caused "worry and distraction [that] chilled and curtailed the

robustness of" Bond's planned protests.  JA297.  It is not surprising that Bond self-censored his expression, particularly when law enforcement essentially asks, "What will it take to get you to shut up?"  *Id.*

These allegations, taken as a whole, pass the threshold standing requirement, particularly when the pro se complaint is liberally construed, as it must.  In *Benham*, for example, this Court recognized that a challenged regulation allowing one group to be displaced by another due to permit requirements "might be a cognizable constitutional injury on the ground that it would hamper event organizers from organizing, publicizing, or carrying out First Amendment protected expression and assembly."  635 F.3d at 138.  In the same case, this Court appreciated a cognizable injury may occur when a regulation might interfere with an organizer's "'need[] to plan the substance' or, at least, 'placement' of their message," *id.* (citing *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 389 (4th Cir. 2001)), or when "the challenged ordinances caused sufficient self-censorship," *id; see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("The cause of action targets conduct that tends to

*chill* such activity, not just conduct that *freezes* it completely." (emphasis in original)).

The Government's argument before the district court ignored this Court's words in *Benham*. The Government argued to the district court that Bond's First Amendment claim was deficient because Bond "engaged in protests following the questioning by federal agents." *See* JA365. In the Government's view, because Bond conducted some form of protest—no matter how muted—there can be no First Amendment violation.

Not so. "Rather, a credible threat of present or future prosecution under a criminal statute itself works an injury that is sufficient to confer standing to mount a pre-enforcement challenge to that statute." *Rothamel v. Fluvanna Cty., Va.*, 810 F. Supp. 2d 771, 778 (W.D. Va. 2011) (citing *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)); *accord Doe v. Bolton*, 410 U.S. 179, 188 (1973).

Indeed, *Benham* and other cases from this Court confirm that Bond's allegations, when liberally construed, demonstrate that Frederick's and Dugan's threats of arrest sufficiently assert a First Amendment injury. *See Benham*, 635 F.3d at 135 ("[A] claimant need not show [he] ceased those activities altogether to demonstrate an injury

- 50 -

in fact." (internal quotation marks omitted)); *see also Bd. of Cty. Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 674 (1996) (recognizing that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct prohibition against the exercise of First Amendment rights" (citations and alterations omitted)).

Ultimately, the district court gave no consideration to the additional allegations and little, if any, analysis of the applicable law. The district court's opinion does not acknowledge this Court's recognition that "standing requirements are somewhat relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 235 (citing *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)); *see also Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing." (internal quotation marks and citations omitted)); *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.").

In sum, the First Amendment violation asserted Bond's second amended complaint was not futile. Had the district court actually analyzed Bond's allegations, the court should have concluded that Bond's allegations demonstrate an objectively reasonable chilling of his First Amendment right to protest against the federal judiciary.

### B. The Second Amended Complaint Asserts a Valid *Bivens* Action Against the Named Defendants

Bond's second amended complaint also demonstrates that the *Bivens* action is not futile. When the *Bivens* claim is analyzed under the liberal pleading standard for a pro se plaintiff, Bond has met the standard under Rules 8(a)(2) and 12(b)(6).

Furthermore, based on the second amended complaint, the named defendants are not protected by qualified immunity. Qualified immunity protects federal officials from liability in *Bivens* suits unless a plaintiff can plead "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). In order to satisfy the first prong, a plaintiff must allege sufficient facts that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556

- 52 -

U.S. 662, 676 (2009). As for the second prong, the right's delineations must be "sufficiently definite," so "that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

Importantly, the Government did not argue below that the defendants named in the second amended complaint were protected by qualified immunity. The Government made that argument in its motion to dismiss the original complaint, JA049, but the Government dropped the argument when opposing Bond's second amended complaint, *see* JA362–368. And the district court did not make any such ruling that the new defendants—whether Frederick, Dugan, or Judge Motz—were protected by any type of immunity. *See* JA079–106; JA270; JA415–416. Judge Faber did refer back to his original dismissal ruling, but the substance of that opinion, as it relates to *Bivens* or qualified immunity, is inapplicable to the newly named defendants.

## IV.    Conclusion

Based on the foregoing, the district court's denial of Bond's Rule 60(b) motion should be reversed. The district court's final judgment should be vacated, and the district court should be ordered to enter the

second amended complaint as filed and proceed to the merits of Bond's allegations.

## V.    Request for Oral Argument

Pursuant to Local Rule 34(a), counsel for Appellant respectfully submits that oral argument should be heard in this appeal.  The appeal raises important issues concerning (a) the First Amendment and the chilling effect based on threats of arrest, (b) pro se access to the judicial system, and (c) ensuring that all litigants are treated fairly.

Date: March 19, 2018                    Respectfully submitted,

Richard A. Posner
Office of Richard Posner
1222 East 56th Street
Chicago, Illinois 60637
(773) 955-1351
rposner62@gmail.com

Matthew J. Dowd
Dowd PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 573-3853
mjdowd@dowdpllc.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the word-length limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).  This brief contains 10,370 words, excluding the portions set forth in Federal Rule of Appellate Procedure 32(f).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Century type.

*/s/ Matthew J. Dowd*
Matthew J. Dowd
Dowd PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 573-3853
mjdowd@dowdpllc.com

Dated: March 19, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on this day, March 19, 2018, the foregoing was electronically filed and therefore served electronically via the court's ECF/CM system on all counsel of record.

I further certify that paper copies of the brief will be delivered to the Court on March 20, 2018.

*/s/ Matthew J. Dowd*
Matthew J. Dowd
Dowd PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 573-3853
mjdowd@dowdpllc.com

Dated: March 19, 2018