2017-2150

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

WILLIAM C. BOND,
*Appellant,*

v.

UNITED STATES,
*Appellee.*

---

Appeal from the United States District Court for the
District of Maryland, Case No. 1:16-cv-02723-DAF,
Senior District Judge David A. Faber

---

## REPLY BRIEF OF APPELLANT WILLIAM C. BOND

---

Richard A. Posner
Office of Richard Posner
1222 East 56th Street
Chicago, Illinois 60637
(773) 955-1351
rposner62@gmail.com

Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 573-3853
mdowd@dowdscheffel.com

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................... 4

I.   The District Court Contravened *Foman* And Failed To
     Address The Additional Allegations .................................................. 4

II.  Bond's Second Amended Complaint States A Valid *Bivens*
     Claim Under The First Amendment .............................................. 12

     A.   On Appeal, the Government Makes Inferences Against
          Bond, Just as the District Court Did ................................... 14

     B.   The Relaxed Standard for First Amendment Standing
          Applies Because Bond Alleged Self-Censorship in
          Response to the Threats of Arrest ....................................... 18

     C.   Regardless of the Particular Standard, The Second
          Amended Complaint Plausibly Alleges An Objective
          Infringement of Bond's First Amendment Rights ................ 21

III. Contrary To The Government's Assertion, Bond Deserves
     The Protections Afforded To Pro Se Litigants, And The
     District Court Failed To Apply The "Less Stringent"
     Standard ............................................................................................ 27

IV.  Conclusion ........................................................................................ 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Arizona Right to Life Political Action Committee v. Bayless*,
 320 F.3d 1002 (9th Cir. 2003)........................................................ 19, 20

*Benham v. City of Charlotte*,
 635 F.3d 129 (4th Cir. 2011)........................................................ 22, 23

*Booker v. South Carolina Department of Corrections*,
 855 F.3d 533 (4th Cir. 2017)................................................................ 27

*Boston Correll v. Herring*,
 212 F. Supp. 3d 584 (E.D. Va. 2016)............................................. 13, 14

*Bright v. Westmoreland County*,
 380 F.3d 729 (3d Cir. 2004)................................................................ 11

*Chase v. Town of Ocean City, Maryland*,
 No. ELH-11-1771, 2015 WL 4993583 (D. Md. Aug. 19, 2015) ........... 24

*Constantine v. Rectors & Visitors of George Mason University*,
 411 F.3d 474 (4th Cir. 2005).................................................................. 2

*Cooksey v. Futrell*,
 721 F.3d 226 (4th Cir. 2013)................................................... 13, 22, 23

*DiLeo v. Ernst & Young*,
 901 F.2d 624 (7th Cir. 1990)................................................................ 11

*D.L.S. v. Utah*,
 374 F.3d 971 (10th Cir. 2004)............................................................. 26

*Donohoe v. Duling*,
 465 F.2d 196 (4th Cir. 1972)................................................................ 25

*Edwards v. City of Goldsboro*,
 178 F.3d 231 (4th Cir. 1999).................................................................. 7

*Equal Rights Center v. Niles Bolton Associates*,
    602 F.3d 597 (4th Cir. 2010)................................................................5

*Erickson v. Pardus*,
    551 U.S. 89 (2007) (per curiam) ........................3, 28, 29, 30

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ........................................................28, 29

*Foman v. Davis*,
    371 U.S. 178 (1962) ..........................................................4, 5

*Haines v. Kerner*,
    404 U.S. 519 (1972) ..........................................................28

*HealthSouth Rehabilitation Hospital v.*
*American National Red Cross*,
    101 F.3d 1005 (4th Cir. 1996)............................................7

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ........................................................16, 17

*Houck v. Substitute Trustee Services, Inc.*,
    791 F.3d 473 (4th Cir. 2015)............................................16

*In re PEC Solutions, Inc. Securities Litigation*,
    418 F.3d 379 (4th Cir. 2005)..........................................7, 8

*Jenkins v. McKeithen*,
    395 U.S. 411 (1969) ..........................................................18

*King v. Rubenstein*,
    825 F.3d 206 (4th Cir. 2016)............................................28

*Martin v. Duffy*,
    858 F.3d 239 (4th Cir. 2017)............................................28

*Matrix Capital Management Fund, LP v. Bearing-Point, Inc.*,
    576 F.3d 172 (4th Cir. 2009)..............................................5

*Morrison v. Board of Education*,
    521 F.3d 602 (6th Cir. 2008)............................................25

*North Carolina Right to Life, Inc. v. Bartlett,*
　168 F.3d 705 (4th Cir. 1999) ................................................................ 24

*PETA v. Rasmussen,*
　298 F.3d 1198 (10th Cir. 2002) ........................................................... 24

*Republican Party of North Carolina v. Martin,*
　980 F.2d 943 (4th Cir. 1992) ................................................................ 18

*Scott v. Family Dollar Stores, Inc.,*
　733 F.3d 105 (4th Cir. 2013) .................................................................. 4

*SD3, LLC v. Black & Decker (US) Inc.,*
　801 F.3d 412 (4th Cir. 2015) ................................................................ 16

*Secretary of State of Maryland v. Joseph H. Munson Co.,*
　467 U.S. 947 (1984) ............................................................................... 19

*Steffel v. Thompson,*
　415 U.S. 452 (1974) ............................................................................... 17

*Stone v. City of Kiowa,*
　950 P.2d 1305 (Kan. 1997) ................................................................... 11

*Susan B. Anthony List v. Driehaus,*
　134 S. Ct. 2334 (2014) .......................................................................... 16

*Virginia Society for Human Life, Inc. v.*
　*Federal Election Commission,*
　263 F.3d 379 (4th Cir. 2001) ................................................................ 23

*Wikimedia Foundation v. National Security Agency,*
　857 F.3d 193 (4th Cir. 2017) ................................................................ 18

**Rules**

Federal Rule of Civil Procedure 59(e) ..................................................... 29

## Other Authorities

Douglas R. Richmond,
    *Unoriginal Sin: The Problem of Judicial Plagiarism*,
    45 Arizona State Law Journal 1077 (2014)........................................ 11

Richard A. Posner, *The Little Book of Plagiarism* (2007)....................... 12

# INTRODUCTION

The ultimate issue is whether Bond's second amended complaint stated plausible violations of his First Amendment rights. Rather than explain why Bond's amended allegations fell short, the district court chastised a pro se litigant for trying to improve his complaint. The Government's short response brief perpetuates the district court's errors and now claims that, because Bond included headings and numbered paragraphs in his pleadings, for example, he does not deserve the benefits other pro se litigants receive. Our judicial system can and must do better.

Bond's second amended complaint describes extraordinary circumstances leading to the First Amendment violations. One federal judge warned a Baltimore attorney to "stay away" from Bond. Another federal judge expressed disdain to third parties about Bond because Bond had filed a privacy violation suit against a hospital, for which the judge was the Chairman of the Board of Trustees. A third warned Bond in an ex parte conversation that his cases "should never have been brought" and that they "would never let him win." Such judicial antagonism toward a single individual is far from common.

It was shocking, then, when federal law enforcement agents threatened to arrest Bond for sham firearms violations just days before his protests against the Maryland federal judiciary. He also learned that he was being surveilled. Any reasonable person faced with such threats and surveillance would have self-censored his criticisms of the judges, particularly when one of the judges was thought to have been directing the agents' actions.

Bond explained to the best of his ability how he self-censored his protests. Among other points, he alleged that one law enforcement agent asked, "What will it take to get you to shut up?" Bond explained how he had to consult a criminal defense attorney and others. The "worry and distraction chilled and curtailed the robustness of" his protest. The Government itself acknowledges that, "after the District Court informed Bond that he needed evidence of self-censorship," Bond "allege[d] that he curtailed or diluted his speech." Resp. Br. 13. These allegations describe the precise scenario the First Amendment prohibits—namely, government "conduct that tends to *chill* such activity, not just conduct that *freezes* it completely." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (emphasis in original).

The Government now takes the extraordinary position that Bond does not deserve the protections given to other pro se litigants. The Government's position both astounds and offends. Citing not one case to support its position, the Government ignores controlling precedent, both from this Court and the Supreme Court.

Most revealing is the Government's silence on the legal standards. The Government does not once argue that the district court applied the proper "less stringent" "liberal construction" standard, as required by *Erickson v. Pardus*, 551 U.S. 89 (2007) (per curiam). The district court never used or identified the correct standard. Instead, according to the Government, "Bond's concerns related to his pro se status are not relevant here." Why? Apparently, in part, because Bond included headings and paragraph numbers in his pleadings. But that can't be enough.

The Government's response epitomizes the very problems with how the federal judicial system handles pro se matters. The Government seems to believe that, because Bond understood a few court rules, then he should not be treated as a pro se litigant. That is an absurd position.

Perhaps worse yet, the district court's opinion dismissing Bond's original complaint was little more than copying and pasting from the Government's motion. The district court's laziness leaves a pro se litigant with the perception that the judge did not independently analyze Bond's complaint. The district court's actions create the impression of plagiarism and an abdication of its independent judicial duties.

Article III district courts have the resources to produce more than a copy-and-paste job, followed by two unexplained orders and unsupported accusations of wasting judicial resources. This response to a pro se litigant only feeds into an unhealthy distrust of the judicial system—especially as access to justice becomes more limited, as fewer cases reach a jury, and as more cases are shunted to arbitration. Litigants, particularly pro se litigants such as Bond, must not have the courthouse doors closed to them without a reasoned explanation.

## ARGUMENT

### I. The District Court Contravened *Foman* And Failed To Address The Additional Allegations

The Government acknowledges that the district court did not address the new factual allegations in Bond's second amended complaint. Under Supreme Court and this Court's precedent, that is enough to find

error in the district court's decisionmaking.  *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 121 (4th Cir. 2013); *Equal Rights Center v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010) ("[A] district court has discretion to deny a motion to amend a complaint, so long as it does not outright refuse to grant the leave without any justifying reason." (quotation omitted)); *Matrix Capital Mgmt. Fund, LP v. Bearing-Point, Inc.*, 576 F.3d 172, 194 (4th Cir. 2009).

As explained in Bond's opening brief, the "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman*, 371 U.S. at 182.  The Government's response brief largely ignores *Foman* and the many other appellate decisions, cited in Bond's opening brief, explaining that a district court must explain why it denied leave to amend.

According to the Government, the district court did not have to explain its dismissal of Bond's pro se amended complaint because the reasons for dismissal were "apparent."  *See* Resp. Br. 8–9.  Despite its argument, the Government then proceeds to "thoroughly explain[]" why

the reasons for dismissal were apparent. *Id.* at 9–16. This seems inherently contradictory.

Nor can the reason (or reasons) be apparent. The Government admits that at least some of the factual allegations of new. See Resp. Br. 12 (stating that "many," not all, "facts are not new"). This admission that at least some facts are new is enough to demonstrate that the district court's original dismissal complaint was not a sufficient explanation for a pro se litigant such as Bond. Moreover, these new facts, as well as the exhibits, responded directly to the district court's conclusion that "[t]here is no allegation whatsoever that any of the named Defendants did anything at all to restrict Plaintiff's First Amendment rights." JA095.

Beyond that, the Government cites no case supporting its contention that a pro se litigant can be left guessing about why the district court thought his complaint fell short. Experienced counsel might be able to decipher a district court's unexplained dismissal, but the same is not true for pro se litigants.

The three cases the Government relies on are inapposite to Bond's appeal. Unlike here, the parties in the three cases were each represented

by counsel. None of the three cited cases involved a pro se litigant whose complaint had to be liberally construed under a less stringent standard.

The Government first relies on *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999), *see* Resp. Br. 8–9, a case in which a district court was found to have abused its discretion for the very same lack of explanation as present in Bond's appeal, 178 F.3d at 242. Thus, *Edwards* does not support a district court's unexplained dismissal of a pro se complaint because the reasons for dismissal were "apparent."

Equally inapposite is the next case the Government cites, *HealthSouth Rehabilitation Hospital v. American National Red Cross*, 101 F.3d 1005 (4th Cir. 1996). In *HealthSouth*, the plaintiff asked to amend its complaint only after discovery and only if the court were inclined to grant the defendant's motion for summary judgment. *Id.* at 1008. When a proposed amendment comes so late in litigation, denial of the amendment plainly falls within the court's discretion without further explanation.

The Government also turns to *In re PEC Solutions, Inc. Securities Litigation*, 418 F.3d 379 (4th Cir. 2005), but again, that case does not condone the district court's refusal to explain its dismissal of Bond's pro

se amended complaints.  In *PEC Solutions*, in a class action case about a government contract with the Transportation Security Administration, the district court explained why the plaintiff had failed to plead the scienter requirement of the fraud claim.  *Id.* at 391.  In the same decision, the district court denied leave to amend, referring to the earlier portion of the same opinion.  *Id.*  This Court found the reason the amendment failed to be in the same opinion itself.  And importantly the class of plaintiffs in *PEC Solutions* was not pro se.

The Government also contends that the district court did not need to "reprint" or "copy and paste" portions of its earlier opinion.  But that contention rings hollow, particularly with a pro se litigant.  When a pro se litigant amends his complaint and adds factual allegations beyond what was in prior complaints, the pro se litigant deserves an explanation of why the new allegations fail.

The Government's point about "copying and pasting" rings particularly hollow here because, in its order dismissing the original complaint, the district court did little more than copy and paste paragraphs from the Government's motion to dismiss.  Several sections of the district court's opinion are copied—either verbatim or with minor,

non-substantive variations—from the Government's motion to dismiss.

One example follows.

| Government Motion (JA041-051) | Dismissal Opinion (JA079-106) |
|---|---|
| Here, Plaintiff has not stated a *Bivens* claim against any of the Defendants. SAC Perkins and Marshal Hughes are not identified in the body of the Complaint, and there is no factual content in the Complaint explaining how either of these Defendants violated Plaintiff's constitutional rights. To the extent that they are named as supervisors of the federal agents discussed in the Complaint, *Bivens* does not permit respondeat superior liability. *See Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Thus, Plaintiff has failed to state a *Bivens* claim as to SAC Perkins and Marshal Hughes. | Here, Plaintiff has not stated a *Bivens* claim against any of the Defendants. The body of the Complaint fails to identify SAC Perkins and Marshal Hughes. The Complaint contains no content explaining how either of these Defendants may have violated Plaintiff's constitutional rights. To the extent that they are named as supervisors of the federal agents discussed in the Complaint, *Bivens* does not permit respondeat superior liability. *See Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) ("In a Bivens suit, there is no respondeat superior liability."); . . . . Thus, Plaintiff plainly has failed to state a *Bivens* claim as to SAC Perkins and Marshal Hughes. |
| Regarding U.S. Attorney Rosenstein, Plaintiff's Complaint states, "[w]hen [U.S. Attorney Rosenstein] was assigned to Maryland in 2006, part of his assignment was to continue to ignore and/or cover-up the aforementioned conspiracy against Plaintiff." (Compl. ¶ 92.) Plaintiff, however, has not provided any facts to support his | With respect to U.S. Attorney Rod Rosenstein, Plaintiff's Complaint states: "[w]hen [Rosenstein] was assigned to Maryland in 2006, part of his assignment was to continue to ignore and/or cover-up the aforementioned conspiracy against Plaintiff." Doc. No. 1. Plaintiff, however, has supplied no facts at all to support his allegation that |

| | |
|---|---|
| allegation that U.S. Attorney Rosenstein, himself, acted to violate Plaintiff's constitutional rights. Plaintiff's conclusory allegations regarding a "cover-up" and a "conspiracy," without more, are not assumed to be true and fail to state a claim. *Iqbal*, 556 U.S. at 681 (citing *Twombly*, 55 U.S. at 554-55). Accordingly, Plaintiff has failed to state a Bivens claim against U.S. Attorney Rosenstein. | Rosenstein, himself, did anything to violate Plaintiff's constitutional rights. Plaintiff's conclusory allegations—he calls it a "cover-up" and a "conspiracy" but nothing more, Doc. No. 1,—fail to state a claim. *See Iqbal*, 556 U.S. at 681 (citing *Twombly*, 55 U.S. at 554-55). Therefore, Plaintiff has failed to state a Bivens claim against U.S. Attorney Rosenstein. |
| JA046. | JA091–092. |

As is evident from the above, the district court essentially copied and pasted the Government's argument on the *Bivens* claim. There court made minor word changes, such as using "therefore" instead of "accordingly" in the last sentence. But most of the text is identical.[1] The district court is not formally prohibited from copying sections of the Government's brief, but the practice raises troubling concerns in pro se litigation.

---

[1] Additional sections of the opinion are also nearly verbatim identical with the Government's motion. *Compare* JA047–048 *with* JA093–095; *compare* JA049 *with* JA103–104.

As Judge Easterbrook, writing for the Seventh Circuit, explained: "A district judge could not photocopy a lawyer's brief and issue it as an opinion. Briefs are argumentative, partisan submissions. Judges should evaluate briefs and produce a neutral conclusion, not repeat an advocate's oratory." *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990).

Pro se litigants, such as Bond, will think the judicial process is compromised or biased when a trial court judge does little more than copy entire sections of the Government's brief. *See Bright v. Westmoreland Cnty.*, 380 F.3d 729, 732 (3d Cir. 2004) ("When a court adopts a party's proposed opinion as its own, the court vitiates the vital purposes served by judicial opinions."); *Stone v. City of Kiowa*, 950 P.2d 1305, 1308 (Kan. 1997) (describing this practice as "the sort of shorthand that would be susceptible to abuse"); Douglas R. Richmond, *Unoriginal Sin: The Problem of Judicial Plagiarism*, 45 Ariz. State L.J. 1077, 1086 ("Copying a party's brief, legal memorandum, or other submission verbatim

potentially signals that the court did not independently assess the case as a matter of fact or law, and may create the appearance of bias.").[2]

In short, the Government's reliance on the original dismissal opinion falters given the district court's copying and pasting of large sections of the Government's motion. From Bond's perspective, as a pro se litigant, the district court judge did not independently assess his amended complaints.[3] In this circumstance, when considering an amended complaint by a pro se litigant, the district court's abuse of discretion is all the more pronounced.

## II. Bond's Second Amended Complaint States A Valid *Bivens* Claim Under The First Amendment

Turning to the First Amendment allegations, the ultimate issue is whether Bond's second amended complaint stated a plausible *Bivens* claim for relief under the First Amendment. The Government limits its analysis to select statements, *see* Resp. Br. 11, but the second amended

---

[2] To be clear, we are not saying that the district court's copying was "plagiarism." *See* Richard A. Posner, *The Little Book of Plagiarism* 20–23 (2007). Instead, wholesale copying in the context of pro se litigation undermines confidence in the judicial process.

[3] Indeed, Judge Faber dismissed Bond's first amended complaint before the Government could even oppose Bond's first attempt to amend his complaint. *See* JA270.

complaint must be read in its entirety, accepting factual allegations as true and making reasonable inferences in Bond's favor. When done, only one reasonable conclusion can be reached: A reasonable person would have felt objectively threatened for seeking to fully exercise his First Amendment rights, and, based on that fear, that person would have refrained from expressing some ideas critical of federal judges.

The Government adopts several erroneous approaches on appeal. First, trying to make up for the district court's lack of explanation, the Government makes impermissible inferences in its favor, instead of Bond's. Second, the Government incorrectly rejects the relaxed standard for First Amendment claims. Finally, the Government tries to excuse the alleged First Amendment violations—*e.g.*, the threats of arrest for protesting—because Bond had the fortitude to proceed with limited, attenuated protests. But that is the wrong focus. The issue is whether the law enforcement agents' actions and words created an unconstitutional, objective chill of Bond's First Amendment rights. As one district court has explained when applying this Court's precedent, "[t]he unconstitutional chill itself is an injury, where fear of prosecution is objectively reasonable." *Boston Correll v. Herring*, 212 F. Supp. 3d

584, 600 n.11 (E.D. Va. 2016) (citing *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013)).

## A. On Appeal, the Government Makes Inferences Against Bond, Just as the District Court Did

In reviewing the dismissal of a complaint, this Court must assume as true the well-pleaded facts and must "draw all reasonable inferences in favor of the plaintiff." *Cooksey*, 721 F.3d at 234. On appeal, the Government disregards these requirements, just as the district court did.[4] The Government impermissibly makes inferences against Bond, some of which contradict the allegations of the second amended complaint.

First, Bond's second amended complaint asserted that the underlying purpose of the questioning by law enforcement agents was to intimidate Bond from exercising his First Amendment rights. Indeed, Bond alleged that "the timing of these visits, especially the attempt to arrest plaintiff for illegal weapons possession, was intended with one goal and one goal only in mind: to prevent and/or intimidate plaintiff's

---

[4] We note that the Government does not acknowledge this legal standard in its Response Brief.

planned demonstrations at the Baltimore U.S. Courthouse on August 4, 2013." JA296.

Despite this clear allegation, the district court incorrectly concluded that Bond "does not seriously contest that the reason for the interviews was concern about the safety of federal judges and other government officials due to [Bond's] communications with them." JA094. Nothing could be more contrary to Bond's allegations. On appeal, the Government doubles down on the district court's error and asserts that the federal agents questioned Bond "out of concern for the safety of certain government officials and federal judges." Resp. Br. 1. These are improper inferences made against Bond's favor and are contrary to the second amended complaint.

Similarly, the district court wrote that "it is more likely that Defendants visited Plaintiff and/or sought to arrest him because of *bona fide* and perfectly lawful concerns about illegal conduct on Plaintiff's part, rather than any retaliation Defendants wanted to inflict on Plaintiff." JA099. This is the precise weighing of competing inferences impermissible at the Rule 12(b)(6) stage, which this Court has warned against:

When a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the complaint. But it is not our task at the motion-to-dismiss stage to determine "whether a lawful alternative explanation appear[s] more likely" from the facts of the complaint.

*SD3, LLC v. Black & Decker (US) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

The Government also asserts that the "[t]he threatened-arrest allegation is neither new nor relevant to self-censorship." Resp. Br. 12. This assertion ignores the most reasonable inference that being threatened with arrest over an upcoming protest speaks directly to whether the Government infringed Bond's First Amendment rights. Indeed, many First Amendment cases consider whether credible threats of arrest or prosecution created an objectively reasonable chilling effect of an individual's First Amendment rights. *E.g.*, *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014). Relevant factors include: (1) past enforcement against plaintiff; (2) official threats of enforcement made specifically against plaintiff; and (3) frequency of enforcement against similarly situated persons. *See id.*; *Holder v. Humanitarian Law*

*Project*, 561 U.S. 1, 15 (2010); *Steffel v. Thompson*, 415 U.S. 452, 455–59 (1974).

Here, the allegations of threatened arrests highlight the objectively reasonable chilling effect Bond experienced. The law enforcement agents made these threats directly to Bond, mere days before the protest. JA291–299. Judge Motz, according to the complaint, was "independently operating & controlling the government agents outside of the normal 'chain-of-command.'" JA295. And Bond had been arrested before and later cleared for a similar charge. JA302–306. Taken together, the only reasonable inference is that the threatened-arrest allegations relate directly to the First Amendment violation and chilled Bond's free speech rights.

The Government also makes other inferences against Bond. It argues that Bond was more resolved to protest after the threatened arrests. *See* Resp. Br. 5, 14. It suggests that the surveillance allegations are not relevant. These are inferences against Bond, however—and made not by the district court but by the Government for the first time on appeal. And the more reasonable inference is that the surveillance contributed to the chilling of Bond's speech. Indeed, government

surveillance may be enough to establish standing to bring a claim for a First Amendment violation.  *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 211 (4th Cir. 2017).

In short, the Government argues the merits of the First Amendment violation by making inferences in its favor, instead of Bond's favor.  If the Government is so confident about the strength of its case, then it can have an opportunity to prove its defenses after answering Bond's second amended complaint.  The parties can conduct focused discovery to develop the evidence needed to prove or disprove the claims and defenses.  But the Government cannot avoid the merits of Bond's First Amendment claim by making inferences in its favor at the pleading stage.  *See Jenkins v. McKeithen*, 395 U.S. 411, 421–22 (1969); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

### B. The Relaxed Standard for First Amendment Standing Applies Because Bond Alleged Self-Censorship in Response to the Threats of Arrest

The Government argues that the relaxed standing requirement in First Amendment cases does not apply here.  The Government is incorrect.

Bond's allegations of self-censorship fall squarely within the line of cases the Government relies on. For instance, the Government quotes *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984):

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

The Court's guidance in *Munson* applies to Bond, who alleged that he self-censored his protest. In the words of the *Munson* Court, "[r]ather than risk punishment for his conduct," Bond "refrain[ed] from engaging further in the protected activity," and he chose to conduct a "muted" protest.

Similarly, the Government mentions the "hold his tongue and challenge" approach from *Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). *See* Resp. Br. 15–16. This standard is equally applicable. Bond alleged that he held his tongue. JA318. As the Ninth Circuit explained, "when the threatened

enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Ariz. Right to Life*, 320 F.3d at 1006. Bond's self-censorship establishes standing, especially with the inquiry "tilt[ed] dramatically toward a finding of standing."

One Government concession further supports why the relaxed standing requirement applies. According to the Government, "[t]his relaxed standard would have been implicated if Bond had filed suit after he was questioned but before he protested." Resp. Br. 16. The Government thus acknowledges that Bond had been threatened enough to bring suit before his muted protest. But the applicable standard does not depend on when the suit is brought. Instead, the fact that Bond held his tongue controls. Just because Bond held a partial, less robust protest does not deprive him of standing under the First Amendment to challenge the threatening law enforcement actions that caused him to self-censor.

The Government is essentially asking for an all-or-nothing standing test for potential First Amendment violations, but that approach does not comport with the nuances of First Amendment law. Speech and content are complex, and the scenarios are rarely neat and

simple. Threatened law enforcement actions may chill certain speech but not other speech. When an individual refrains from saying some things but not others, the individual can still bring a First Amendment claim. The relaxed "standing" requirement under the First Amendment still applies because the individual partially held his tongue and was afraid to fully express himself.

### C. Regardless of the Particular Standard, The Second Amended Complaint Plausibly Alleges An Objective Infringement of Bond's First Amendment Rights

The second amended complaint, when read start-to-finish, presents a plausible First Amendment violation. Bond was subjected to a credible threat of law enforcement action in connection to his planned protest, and, because of that threat, he self-censored his protest.

Bond alleged that he had to "consult a criminal defense lawyer, other lawyers and business people, [and] numerous friends" because of his concern about the threats from law enforcement. JA296. He cited financial harm as well. JA296. Bond suffered "worry and los[t] much sleep." *Id.* The actions of the law enforcement officials caused "worry and distraction [that] chilled and curtailed the robustness of" Bond's planned protests. JA297.

On point is this Court's instruction in *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011):

> We have recognized that, to demonstrate injury in fact, it is sufficient to show that one's First Amendment activities have been chilled. Subjective or speculative accounts of such a chilling effect, however, are not sufficient. Any chilling effect must be objectively reasonable. Nevertheless, a claimant need not show [he] ceased those activities altogether to demonstrate an injury in fact. Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.

*Id.* (internal quotation marks, citations, and alterations omitted). Thus, the standard is whether the government action "is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." The issue is not whether Bond stopped *all* his activities but whether the government's "actions would be 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Cooksey*, 721 F.3d at 236 (quoting *Benham*, 635 F.3d at 135).

Bond's standing to bring his First Amendment claim is like the plaintiff's standing in *Cooksey*. There, the plaintiff Steve Cooksey had filed a First Amendment claim based on threatened actions by the North Carolina Board of Dietetics/Nutrition about his website. Cooksey had "actually ceased expressing opinions in the form of personal dietary

advice on the mentoring and Dear-Abby-style sections of the website." *Id.* (citation and quotation omitted). But he did not completely shut down his website. This was enough to establish standing, but this Court held that Cooksey "did not even have to go that far for an injury-in-fact to lie." *Id.* (citing *Benham*, 635 F.3d at 135 ("[A] claimant need not show [he] ceased those activities altogether to demonstrate an injury in fact." (internal quotation marks omitted))).

In *Benham*, this Court found a cognizable First Amendment violation when a regulation "would hamper event organizers from organizing, publicizing, or carrying out First Amendment protected expression and assembly." 635 F.3d at 138. The Court also recognized, as a potential First Amendment violation, interference with an organizer's "'need[] to plan the substance' or, at least, 'placement' of their message." *Id.* (citing *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 389 (4th Cir. 2001)).

Bond's First Amendment injuries are essentially the same as those recognized in *Benham*, *Cooksey*, and *Virginia Society for Human Life*. Bond was exposed to the same types of interference with "organizing, publicizing, or carrying out First Amendment protected expression and

assembly" because of the threatened arrest. The threat of arrest caused "worry and distraction [that] chilled and curtailed the robustness of" Bond's planned protests. JA297.

Thus, "[t]he mere threat of prosecution suffices because such a threat 'tends to chill the exercise of First Amendment rights' and leads to self-censorship, which constitutes an injury in and of itself." *Chase v. Town of Ocean City, Md.*, No. ELH-11-1771, 2015 WL 4993583, at *7 (D. Md. Aug. 19, 2015) (quoting *N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)); *see also PETA v. Rasmussen*, 298 F.3d 1198, 1203 (10th Cir. 2002) (finding standing for retrospective relief because PETA "suffered an injury in fact to its constitutionally protected right to free speech when the defendants threatened the protesters with arrest if they did not cease their demonstration").

Furthermore, Bond's allegations describe more than a mere "subjective chilling" of his First Amendment rights. Subjective chilling implies the lack of a specific harm and stems from the Supreme Court's analysis in *Laird v. Tatum*, 408 U.S. 1 (1972). In *Laird*, the plaintiffs wanted to stop the Department of the Army's domestic surveillance activities. They premised federal jurisdiction on the chilling effect that

the mere existence of the surveillance had on the plaintiffs' First Amendment rights. *Id.* at 2–3. The Court held that the allegations of a "subjective chill" were "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14.

Indeed, subjective chill is insufficient because there is often no evidence of threatened enforcement; it's only a subjective feeling. For instance, in *Morrison v. Board of Education*, 521 F.3d 602 (6th Cir. 2008), the summary judgment record lacked any evidence that the plaintiff had been threatened with punishment for the allegedly protected speech. As the Sixth Circuit explained, "[t]he record is silent as to whether the school district threatened to punish or would have punished Morrison for protected speech in violation of its policy." *Id.* at 610. The plaintiff could not "point to anything beyond his own subjective apprehension and a personal (self-imposed) unwillingness to communicate." *Id.*

Bond's allegations also differ from those cases in which this Court has found insufficient allegations of a First Amendment violation. For example, in *Donohoe v. Duling*, 465 F.2d 196 (4th Cir. 1972), the police observed the plaintiff but never threatened him with arrest. There was

no allegation that the plaintiff ever self-censored his speech based on police presence.

Bond's case is also distinguishable from those cases where a plaintiff lacked standing because the government provided assurances that it would not prosecute anyone for exercising their free-speech rights. *See, e.g.*, *D.L.S. v. Utah*, 374 F.3d 971, 974 (10th Cir. 2004) (no standing for First Amendment challenge to sodomy law because, in part, prosecutor provided and affidavit stating that "Utah County has not charged anyone with a violation of the challenged sodomy statute"). Unlike in those cases, the federal law enforcement officers never assured Bond that he would not be arrested if he conducted his protests as originally planned.[5]

One additional point is worth noting, in part because the Government does not vigorously press it on appeal. Perhaps Bond's complaints, including the second amended complaint, could have been more specific about the actual content of his speech that he self-censored.

---

[5] The Government may disagree with Bond's assertion that he self-censored his protest. But that is not a sufficient response to a pro se complaint at the pleading stage, where the allegations must be taken as true and all reasonable inferences must be made in Bond's favor.

Perhaps he could have more specifically alleged the exact content he would have expressed during his protests but for the threatened arrest. And if Bond had a lawyer, his lawyer likely would have suggested being more specific. [6] But the district court did not say he was not specific enough about the content of his speech.

All of this is precisely why courts hold pro se pleadings to less stringent standards. *See, e.g.*, *Martin v. Duffy*, 858 F.3d 239, 243 (4th Cir. 2017) (liberally construing pro se complaint to find sufficient allegation of First Amendment violation); *Booker v. S.C. Dep't of Corrections*, 855 F.3d 533, 540 (4th Cir. 2017) (same).

## III. Contrary To The Government's Assertion, Bond Deserves The Protections Afforded To Pro Se Litigants, And The District Court Failed To Apply The "Less Stringent" Standard

As a further error, the Government's response perpetuates the district court's errors by contending that the "liberal construction" standard does not apply to Bond's pro se complaints. The Government's argument is unsupported by citation to any case law. *See* Resp. Br. 19–

---

[6] To be clear, Bond also explained how his protest was muted and less robust when certain activists—alleged to be undercover agents—disrupted his protest planning. *See* JA017–019. These allegations align with the revelations from the U.S. Marshal that Bond had been under surveillance since 2010. JA300–301.

21.  This Court should reject the Government's novel invitation to treat certain pro se litigants differently simply because they may have complied with some formalities, such as paragraph numbering.

The law is clear: The Supreme Court and this Court have required that "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quotation omitted); *accord Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).

Contrary to precedent and the allegations, the Government argues that Bond's "concerns related to his pro se status are not relevant here." Resp. Br. 19.  The Government points to Bond's purported "thorough understanding of the Federal Rules of Civil Procedure and the Local Maryland Rules." *Id.* at 20.  The Government also mentions that Bond's second amended complaint "contains a caption naming the parties" and has "enumerated paragraphs."

The law offers no basis to disregard Bond's pro se status.  The Government cites no case supporting such a novel distinction.  Nor does the Government offer a test by which to distinguish pro se litigants who

warrant the "less stringent" "liberal construction" standard versus those who do not. Perhaps if Bond omitted the caption from his complaint, the Government would agree Bond's amended complaint should be liberally construed.

The Government also overestimates Bond's litigation skills. As one example, Bond mistakenly thought he could file successive Rule 59(e) motions. *See* Opening Br. 24 n.11. His complaint, while reading "like a political thriller," JA104, is far from the gold standard of pleadings. These and other errors he made underscore the litigation traps that await pro se litigants such as Bond.

Ultimately, the Government defends the district court's judgment by advancing a novel and untenable theory that certain pro se litigants do not warrant the protections the Supreme Court established in cases such as *Erickson v. Pardus* and *Estelle v. Gamble*. Not once does the Government ever argue that the district court "liberally construed" Bond's second amended complaint.

Indeed, there is no indication that the district court "liberally construed" any of Bond's complaints under a "less stringent" standard. The district court instead made inferences against Bond. *See supra*. The

district court judge focused on Bond's purported "intent on draining the Federal Judiciary of our limited resources." JA105 (quotation omitted). The district court judge also contended that Bond's "repeatedly unmeritorious supplications are squandering the Third Branch's limited resources." JA416.

This is the first case in which Bond alleged a violation of his First Amendment rights. Judge Faber lacked any foundation for accusing Bond of "squandering" judicial resources. Given his preconceived biases about Bond's allegations, Judge Faber did not hold Bond's pleadings to "less stringent standards than formal pleadings drafted by lawyers," as required by *Erickson*, 551 U.S. at 94. If anything, Judge Faber held Bond to a more stringent standard when he dismissed the second amended complaint without explanation.

## IV. Conclusion

For these reasons, the district court's denial of Bond's Rule 60(b) motion should be reversed. The district court's final judgment should be vacated, and the district court should be ordered to enter the second amended complaint as filed and proceed to the merits of Bond's allegations.

Date: May 14, 2018          Respectfully submitted,

Richard A. Posner
Office of Richard Posner
1222 East 56th Street
Chicago, Illinois 60637
(773) 955-1351
rposner62@gmail.com

Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 573-3853
mdowd@dowdscheffel.com

# CERTIFICATE OF COMPLIANCE

This brief complies with the word-length limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).  This brief contains 5,972 words, excluding the portions set forth in Federal Rule of Appellate Procedure 32(f).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Century type.

*/s/ Matthew J. Dowd*
Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 573-3853
mdowd@dowdscheffel.com

Dated: May 14, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on this day, May 14, 2018, the foregoing was electronically filed and therefore served electronically via the court's ECF/CM system on all counsel of record.

I further certify that paper copies of the brief will be delivered to the Court on May 15, 2018.

*/s/ Matthew J. Dowd*
Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 573-3853
mdowd@dowdscheffel.com

Dated: May 14, 2018